916 P.2d 1233

**The STATE of Hawai'i,
Plaintiff–Appellee,**

v.

**Silverio SOARES, also known as Pedro
Soares, Defendant–Appellant.**

**No. 16725.**

Intermediate Court of Appeals of Hawai'i.

May 8, 1996.

---

Linda C.R. Jameson, Deputy Public Defender, on the brief, Honolulu, for defendant-appellant.

James M. Anderson, Deputy Prosecuting Attorney, City and County of Honolulu, on the brief, Honolulu, for plaintiff-appellee.

Before BURNS, C.J., and WATANABE and KIRIMITSU, JJ.

WATANABE, Judge.

Defendant–Appellant Silverio Soares (Defendant) appeals from the December 4, 1992 Judgment of the First Circuit Court (Judgment), which followed his jury conviction of Assault in the Second Degree, a violation of Hawai'i Revised Statutes (HRS) § 707–711(1)(a) (1993).[1] Defendant contends that the circuit court reversibly erred when it (1) found him fit to proceed to trial, and (2) denied his request for substitute counsel and his counsel's motions to withdraw.

We conclude that the circuit court was wrong when it failed to order *sua sponte*,[2] on the third day of trial, a hearing on Defendant's competence to proceed to trial. De-

fendant's assertion that he had missed his morning appointment to take his regular prolixin shot, as well as his trial counsel's representation that Defendant was acting completely differently from the first day of trial, when juxtaposed against prior psychiatric reports that Defendant posed no risk to others as long as he saw his psychiatrist regularly, avoided substance abuse, and continued his medication, clearly raised a good faith doubt as to whether Defendant's failure to take his medication was affecting his legal competence to proceed to trial. A competency hearing was thus required.

Because the circuit court failed to conduct the necessary hearing, we vacate Defendant's conviction and remand for a new hearing on Defendant's present competency, and a new trial, if Defendant is determined to be competent to proceed to trial under the legal standards set forth in this opinion.

We also conclude that the trial court improperly denied Defendant's request for substitution of his counsel and defense counsel's motions to withdraw, since the court failed to conduct the "penetrating and comprehensive examination" of Defendant required by *State v. Kane*, 52 Haw. 484, 479 P.2d 207 (1971).

## I. BACKGROUND

On June 10, 1990, Defendant and his friend scaled the wall of an apartment complex and interrupted a late afternoon get-together among some residents of the complex. When Defendant and his friend were asked to leave the premises, a scuffle broke out and Defendant stabbed one of the residents in the chest with a knife. An off-duty police officer witnessed the stabbing incident, and Defendant was subsequently arrested and charged with committing the offense of Assault in the Second Degree.

---

1. Hawai'i Revised Statutes (HRS) § 707–711(1)(a) (1993) provides:

 **Assault in the second degree.** (1) A person commits the offense of assault in the second degree if:

 (a) The person intentionally or knowingly causes substantial bodily injury to another[.]

2. "*Sua sponte*" is a Latin phrase meaning "[o]f ... its own will or motion; voluntarily; without prompting or suggestion." *Black's Law Dictionary* 1424 (6th ed. 1990).

## II. PROCEDURAL HISTORY

### A. *Pre–Trial Proceedings*

On August 23, 1990, Defendant filed a Notice of Intent to Rely on Mental Defense and Request for Order Appointing Medical Examiners. That same day, the circuit court issued an order appointing three insanity experts, Linda Yamamoto, Ph.D. (Dr. Yamamoto), Jarret Ko, M.D. (Dr. Ko), and Jack Annon, Ph.D. (Dr. Annon), to examine Defendant and file a written report by October 8, 1990, advising the court on the following questions:

1. Does [Defendant] *at the present time* lack the capacity to understand the criminal proceedings against him/her or to assist in him/her [sic] own defense, *as a result of physical or mental disease, disorder, or defect* (fitness to proceed)?

2. Did [Defendant] *at the time of the alleged conduct,* suffer from a *physical or mental disease, disorder, or defect* which *substantially impaired* his/her *capacity to either* appreciate the wrongfulness of his/her conduct (cognitive capacity) or to conform his/her conduct to the requirements of the law (volitional capacity)?

(Emphases in original.)

In his written report, filed on September 19, 1990, Dr. Annon diagnosed Defendant as suffering from chronic paranoid schizophrenia, which was in partial remission, and psychoactive polysubstance abuse. Dr. Annon also noted that at the time of the incident which led to the charge against Defendant, Defendant was suffering from psychoactive polysubstance intoxication. It was Dr. Annon's opinion that Defendant (1) had sufficient present capacity to understand the

criminal proceedings against him and to assist his counsel in his own defense; (2) did not lack substantial cognitive capacity to know that what he was doing was wrong; and (3) "did not lack substantial volitional capacity to control himself from committing the alleged offenses charged, and to conform his conduct to the requirements of the law, with the exception of his psychoactive polysubstance intoxication."

In her report filed on October 5, 1990, Dr. Yamamoto diagnosed Defendant as suffering, at that time and at the time of the offense, from chronic schizophrenia, paranoid type, as well as organic brain dysfunction attributable to one or more of the following causes: developmental disabilities, substance abuse, and head trauma. Dr. Yamamoto also noted that at the time she examined Defendant, he did not exhibit any psychotic symptoms, "appeared stabilized on his psychotropic medications of Prolixin and Cogentin,"[3] and "was well able to answer questions coherently [although] his thinking process at times was somewhat tangential." Dr. Yamamoto additionally reported that brief psychological testing indicated that Defendant had "neuropsychological deficits of an organic basis." However, Defendant's "cognitive deficits ... [were] not of the nature to have compromised his thinking or actions at [the] time the offense was committed." Furthermore, Defendant "understands the wrongfulness of his offense[,] ... is able to help with his defense[,]" and is "fit to proceed" to trial.

Following an October 15, 1990 hearing on the matter, the circuit court, based on the written reports of Drs. Yamamoto and Annon, found Defendant fit to proceed to trial.[4]

On November 1, 1991, Defendant filed a second Motion for Mental Evaluation of De-

---

**3.** Prolixin is the "trademark for preparations of fluphenazine hydrochloride," which occurs "as a white or nearly white, crystalline powder" and is "used as a tranquilizer in the treatment of manifestations of psychotic disorders, and as an antiemetic, administered orally and intramuscularly." R. Sloane, *The Sloane–Dorland Annotated Medical–Legal Dictionary* at 581, 293 (1987).

Cogentin is the "trademark for preparations of benztropine mesylate," which occurs "as a white, crystalline powder having anticholinergic,

antihistaminic, and local anesthetic actions[.]" Cogentin is "used as an antiparkinsonian agent, administered intramuscularly, intravenously, and orally" to relieve the side effects of psychotropic medications such as prolixin. *Id.* at 155, 581.

**4.** The circuit court did not receive the assessment of Jarret Ko, M.D. (Dr. Ko) prior to the October 15, 1990 hearing. However, the court stated that it would allow a second hearing on the matter if Dr. Ko's assessment were received by

fendant, again giving notice of his intent to rely on the defense of mental irresponsibility, and requesting that he be examined to determine his present fitness to proceed, his mental condition at the time of the alleged offense, and the existence of any mental disease, disorder, or defect which would affect his penal responsibility. Following a December 4, 1991 hearing, the circuit court entered an order dated December 5, 1991, appointing Dr. Douglas Schramel (Dr. Schramel), Dr. Vit Patel (Dr. Patel), and Dr. Annon to examine Defendant and to file a written report solely on the question of whether Defendant, at that time, was fit to proceed to trial.

In his report, pursuant to the second order, Dr. Annon reiterated his earlier diagnosis of Defendant's mental condition and concluded that Defendant "does have sufficient capacity at the present time to understand the criminal proceedings against him, and to assist his attorney in his own defense."

Dr. Schramel, in a June 5, 1992 report, expressed his opinion that Defendant was "lacking in volitional capacity at the time of the alleged offense" and was "presently suffering from" organic delusional disorder. However, Dr. Schramel concluded that Defendant was fit to proceed to trial. Dr. Schramel also noted that "[D]efendant represents a minimal risk to others as long as he continues his present medication and treatment at the VA Mental Health Clinic."

Dr. Patel filed his report on August 10, 1992. In explaining why his report was late, Dr. Patel stated as follows:

This report is being submitted post-haste, for the above-referenced defendant, for whom his public defender has called me

several times to make at least two previous appointments, which [Defendant] did NOT keep. His most recent appointment was made for August 01, 1992, and [Defendant's counsel] had warned me that since [D]efendant was very difficult to reach, he would leave a message at the Central YMCA and hope that he comes. On the appointed day, [D]efendant did not show up. After waiting for another half hour I left. At about 1410 pm, while I was at the Queen's Medical Center, I received a page and called back the number immediately, to find some lady from a downtown store calling me telling me, [Defendant] was seeking directions as to how to find the office!!! I made quick and easiest possible arrangement to see him, and told the caller to have [D]efendant come and meet me at the lobby at the Queen's Medical Center. He did show up 15 minutes later, and was interviewed. Defendant was frankly smelling of alcohol even though he denied he had been drinking. The examination revealed a dirty, disheveled, tremulous, shaky male, who indeed gave [a] history of recent discharge from Queen's where he was hospitalized for alcohol intoxication. Defendant has a long history of alcohol abuse, and demonstrates severe organicity and memory problems, and cannot even give clearly, today's date. He could not give any information in any reliable and coherent manner. Apparently, he also has been a patient at the VA–MHC and receives Prolixin–D intramuscularly every month at that clinic.

Review of his recent Queen's hospitalization from 7/3/92 to 7/22/92 indicates that at the time he had overdoses [sic] on some hallucinogen, was comatose, with ventricu-

the court. The court received Dr. Ko's assessment on March 1, 1991.

Dr. Ko's diagnosis was that at the time of the alleged incident, Defendant was suffering from (1) schizophrenia, in partial remission, (2) alcohol intoxication, and (3) a past history of polysubstance abuse. Dr. Ko noted that "[a]s long as [Defendant] avoids substance abuse, takes his medication consistently[,] [sic] and sees his psychiatrist on a regular basis, he can be managed on an outpatient basis." Dr. Ko was of the

opinion that Defendant's "cognitive and volitional capacities were impaired at the time of the alleged offense(s)," but Dr. Ko could "not say that they were substantially impaired." Dr. Ko also concluded that Defendant "is presently capable of understanding the proceedings against him and of assisting in his own defense."

The record does not indicate whether Dr. Ko's assessment was ever considered by the trial court.

lar fast heart rate, and temperature of 110 F, and had liver and kidney failure.

Based on Defendant's presentation and past history, Dr. Patel diagnosed Defendant as suffering from chronic schizophrenia, severe alcohol dependence with chronic organic brain disorder, and polysubstance abuse. In Dr. Patel's opinion, Defendant was under the influence of alcohol at the time of the alleged offense and, as a result, Defendant's capacity to appreciate the wrongfulness of his conduct and to conform his conduct to the requirements of the law was significantly impaired. Dr. Patel believed, however, that Defendant was able at that time to understand the charges against him and was thus fit to proceed to trial.

On August 19, 1992, after a hearing on Defendant's second motion at which it considered only the written examiners' reports, the circuit court found Defendant fit to proceed to trial.

### B. *Trial Proceedings*

On October 2, 1992, the first day of trial, Defendant, through his counsel, filed a Notice of Withdrawal of Intent to Rely on Mental Defense. On October 5, 1992, the second day of trial, Defendant failed to appear in court, prompting the circuit court to issue a bench warrant for his arrest and to order his bail forfeited.

Defendant appeared in court on the third day of trial and claimed that he had overslept the previous day. The trial court then resumed proceedings. However, as soon as the court had greeted the parties, Defendant addressed the court and made the following request:

Sir, I want to get another lawyer because he has no background, no interest, no background of what my background is, the illness I have. He has no work continuously, Your Honor. I request another lawyer. I request to be at trial to be here my doctor—Louise to be here, she gives me a shot weekly. My doctor take [sic] care—my doctor give [sic] me the medi-

cation for the prolixin shot that I take every week. I request he should be present.

The following colloquy then ensued:

THE COURT: Okay. [Defendant], are you presently under any influence of any alcohol, medication or drugs?

THE DEFENDANT: Prolixin, prolixin shots.

THE COURT: When did you last take your prolixin?

THE DEFENDANT: Last week.

THE COURT: Last week?

THE DEFENDANT: Yes, Sir.

THE COURT: How often do you take it?

THE DEFENDANT: Every week, sir.

THE COURT: And what day last week did you take it?

THE DEFENDANT: The shot today on me this morning, but I missed it. It's to [sic] late now. I have to go in the afternoon.

THE COURT: Okay. Besides the prolixin, are you under any other medication?

THE DEFENDANT: No, that's it, Your Honor.

THE COURT: Okay. Are you under the influence of any alcohol?

THE DEFENDANT: No.

THE COURT: At this time?

THE DEFENDANT: I don't drink.

THE COURT: Is your mind clear at this time?

THE DEFENDANT: Yes, Sir.

THE COURT: Do you understand what's taking place today?

THE DEFENDANT: Well, my psychiatrist should be with me here today, Your Honor, because this Court is real because the sentence you're going to give me is about four to one. You might give me four

342

years in jail you might give me one year in jail.

THE COURT: You understand that you're in court today—

THE DEFENDANT: This court is very important to me.

THE COURT:—for trial?

THE DEFENDANT: This charge is very important to me.

THE COURT: You've been charged with Assault in the Second Degree, do you understand?

THE DEFENDANT: I think the doctor should be present with me like my lawyer's background, my psychiatrist background has four years since I've been in Hawai'i State, four years I've been in Hawai'i State should be present. Louise, my nurse, should be present, must give the shot to me in my thigh. She should be present with me here, somebody, psychiatrist, some lawyer should be—

THE COURT: [Defendant].

THE DEFENDANT: Yes, Sir.

THE COURT: You understand the charge that you're face [sic] with?

THE DEFENDANT: I'm faced with Assault II and illegal weapon against the State of Hawai'i.

THE COURT: Okay. You have been charged with Assault in the Second Degree, you understand that?

THE DEFENDANT: I asked the psychiatrist in my doctor's care, I'm under doctor's care, right now, I have been for the last four years.

THE COURT: Who is your doctor?

THE DEFENDANT: Dr. Coleman and Dr. Wong give me pills. Dr. Wong give me cogentin weekly.

THE COURT: I see. Aside from the prolixin, are you under any other medication?

THE DEFENDANT: No, that's it, take vitamins.

THE COURT: You last took it last week?

THE DEFENDANT: Last week.

THE COURT: And you usually take it every week?

THE DEFENDANT: I'm suppose [sic] to have it right now.

THE COURT: You're suppose [sic] to have one today?

THE DEFENDANT: Right now, at this moment, but I'm late. I couldn't miss the court. I over slept yesterday.

THE COURT: Is your mind clear at this time, [Defendant]?

THE DEFENDANT: My mind wasn't clear yesterday.

THE COURT: Is your mind clear at this time?

THE DEFENDANT: It's clear, Yes, Your Honor.

At that point, the trial court advised Defendant of its order of the previous day, issuing a bench warrant for Defendant's arrest and forfeiting the bail that Defendant had previously posted. The court also informed Defendant that in order to ensure Defendant's future presence at trial, it was ordering the Sheriff's Office to take Defendant into custody. The court then imposed another $5,000 bail amount on Defendant and called a brief recess to allow deputies from the Sheriff's Office to serve the outstanding bench warrant on Defendant, to take Defendant into custody, and to process the necessary paperwork.

After the recess, Defendant's trial counsel requested that the trial court conduct its own questioning of Defendant to determine Defendant's fitness to proceed. Defense counsel also brought an oral Motion to Withdraw as Defendant's counsel because Defendant was refusing to assist counsel in his defense. Defense counsel explained that Defendant's behavior that morning was inconsistent with his behavior on the first day of trial and that Defendant now wanted to proceed with a

mental irresponsibility defense despite his earlier decision to proceed with a self-defense strategy: [5]

> This morning [Defendant] was saying that I'm the one that brought the charges against him and that I'm not representing him, but that I just want to put him in jail. He could not remember the conversation that we had yesterday morning at about 10:30. He says that he did not talk to me, he just got my message saying that he was suppose [sic] to be here today not yesterday.
>
> Further, he stated earlier this morning that he wanted a psychiatrist present, his psychiatrist from the Veteran's Administration.
>
> Further, he was ranting, kind of ranting and going on this morning, completely different behavior from how he behaved Friday morning when we were here for jury selection. So I do question his fitness.
>
> ... [Defendant] has stated that he does not want me to represent him. He's stating now that he wants to proceed with a mental defense.
>
> And before I had sat down with him on more than one occasion and he had decided against going with a mental defense. And, in fact, I did file the Notice of Intent to Withdraw the Mental Defense. He's saying now though that he does not or that he does want to proceed with [a] mental defense and he wants his psychiatrist to come in and testify.
>
> And just before Your Honor walked in, at first he refused to even sit down or be brought in to court to be seated next to me. He's saying that he did not want to be represented by me.

The trial court then engaged in the following discussion with Defendant:

THE COURT: Is that correct, [Defendant]? [Defendant], the Court will here [sic] you.

THE DEFENDANT: Yes, Your Honor. I request another lawyer to represent my stated condition. This lawyer right here, he's not even fit. He doesn't have the facts here from my personal background. He doesn't understand my personal background. Four years in Hawai'i, taking medication, prolixin shots every weekly [sic]. Every weekly [sic] I receive a shot on my thigh and I take some pills to fight off the side affects [sic] of my body turns, makes it turn that way, like this, this way or that way, and making this like that. And plus multi-vitamins I take for my health, more blood in the body.

THE COURT: Okay. Well, [Defendant], let me start with this first. The Court had earlier questioned you on some general questions as to the type of medication that you're presently taking, whether you were under the influence of any alcohol or medication or drugs, do you recall that?

THE DEFENDANT: Yes.

THE COURT: Okay. You had indicated that you had not taken any alcohol. You are under medication, you're taking prolixin?

THE DEFENDANT: Right.

THE COURT: You had taken your last shot one week ago and you were scheduled to take another shot today?

THE DEFENDANT: Yes.

THE COURT: And you also indicated that your mind is clear at this time and you understand what is taking place today?

THE DEFENDANT: Right.

THE COURT: You understand that?

**5.** It appears from the transcripts that based on defense counsel's advice, Defendant had agreed to rely on self-defense rather than a mental disability defense at trial. Defense counsel explained the reason for such advice as follows:

> At the time of the incident, ... Dr. [Vit] Patel found that [Defendant] was lacking in the ability to conform his conduct to the society requirement. And Dr. Patel found him impaired, but I believe due to his alcohol/substance abuse problem, which I believe does not rise to a level of a mental disease.

344

THE DEFENDANT: Yes.

THE COURT: Okay. And you also stated that you understand the charge, you've been charged with Assault in the Second Degree, you understand that?

THE DEFENDANT: Yes, I have Assault III charge.

THE COURT: Do you recall the incident—

THE DEFENDANT: Yes.

THE COURT:—that gave rise to the charge?

THE DEFENDANT: Yes.

The trial court thereafter denied Defendant's request for substitute counsel and defense counsel's Motion to Withdraw as Defendant's [Counsel]:

THE COURT: Okay. Well, [Defendant], with respect as to your request to discharge your [counsel], the Court will deny your request, trial has already started. The Court does not find that your [counsel] is unable to assist in your defense or unable to present your defense.

There may be a difference of opinion as to how your case should be managed, but he is giving you his professional advice as to how the case should be managed. So that will have to be worked out between you two, but the court does not see sufficient grounds to permit you to discharge your [counsel] at this time.

At that point, Defendant spoke up, and the following colloquy transpired:

THE DEFENDANT: I request another lawyer—I will not go one step any further in this case because this case is very important—because my brothers and sisters—after this Court, after this trial is over.

But this lawyer right here is not even fit, he doesn't have a psychiatrist, he doesn't know my four years background. He give—they took my—hundred percent—took away all my money and gave it to the Judge.

THE REPORTER: Excuse me?

THE DEFENDANT:—Circuit Court, this the Circuit Court and gave it all my personal equipment to the Judge and be a legal guardianship of Silverio Soares. But he has no intention to contact my legal guardianship or my sheriff or my sheriff which saw me and put me in this type of condition.

THE COURT: All right. Mr. Soares, your objection is noted for the record. The Court will not permit you to discharge [the deputy public defender] as your counsel. And the Court will order [the deputy public defender] to proceed ahead with your defense.

With respect to the issue as to whether you're fit to proceed at this time, the Court finds that based on your responses to the questions asked, the Court finds that you are fit to proceed.

The Court also notes that you had been previously examined by several psychiatrists and been determined to be fit to proceed. You had been diagnosed to have the condition organic delusional disorder. However, that did not affect your ability to proceed—your fitness to proceed. And the court finds that you are fit to proceed and will proceed ahead with the trial at this time.

THE DEFENDANT: Will I be released to the sheriffs who arrested me?

* * * * * *

THE COURT: No, you will not, you will remain in the custody of the sheriffs.

THE DEFENDANT: Then I'm going to go back to jail then?

THE COURT: Yes, unless you can post $5,000 in bail.

Defense counsel renewed his oral Motion to Withdraw after a brief recess during the first day of testimony. In support of his motion, defense counsel explained that Defendant had refused to communicate with him during that recess and that Defendant's

failure to communicate "might hinder defenses available to him." The State objected to the motion and the trial court denied defense counsel's request.

At the close of the State's case, defense counsel informed the court that Defendant, who had previously agreed to withdraw his mental irresponsibility defense, to rely on the defense of self-defense, and to testify on his own behalf, was now refusing to take the stand. After explaining that Defendant was refusing to communicate with him, defense counsel requested that the court question Defendant as to why Defendant would not testify.

Upon questioning by the court, Defendant responded that he understood defense counsel's advice that he should take the stand to testify. However, he remained steadfast in his decision not to testify and the defense had no choice but to rest without presenting any evidence.

Before the court went into recess for the day, defense counsel stated for the record that Defendant "is kind of shaking a bit." Defense counsel requested that the medical unit at the Oahu Community Correctional Facility examine Defendant and ensure that he receive his medication. The court, acknowledging that Defendant was supposed to have his medication, instructed the sheriff to bring Defendant to the Oahu Correctional Facility's medical doctor to be examined.

When trial reconvened the next morning, defense counsel stated for the record that Defendant was still refusing to communicate with him. The trial court conducted no inquiry as to whether its order of the previous day, that Defendant be examined by a medical doctor and be administered his medication, had been complied with. Closing arguments were then held, and that afternoon, the jury returned a guilty verdict. The court thereafter sentenced Defendant to serve one year in prison and five years' probation. This timely appeal followed.

## III. DISCUSSION

### A. Defendant's Fitness to Proceed

#### 1. The Procedural Requirements for Determining a Defendant's Fitness to Proceed to Trial

■ It is a fundamental precept of the American system of justice that a "person whose mental condition is such that he [or she] lacks the capacity to understand the nature and object of the proceedings against him [or her], to consult with counsel, and to assist in preparing his [or her] defense may not be subjected to a trial." *Drope v. Missouri*, 420 U.S. 162, 171, 95 S.Ct. 896, 903, 43 L.Ed.2d 103 (1975). This principle, an outgrowth of the common law prohibition against trials *in absentia*, is premised on the recognition that a mentally incompetent defendant, although physically present in the courtroom, is, even with the assistance of counsel, afforded no real opportunity to present a defense. *Id.*

■ "[C]onviction of an accused person while he [or she] is legally incompetent violates due process, and ... state procedures must be adequate to protect this right." *Pate v. Robinson*, 383 U.S. 375, 378, 86 S.Ct. 836, 838, 15 L.Ed.2d 815 (1966) (citation omitted). Moreover, the "[f]ailure of a state court 'to observe procedures adequate to protect a defendant's right not to be tried or convicted while incompetent to stand trial deprives him of his due process right to a fair trial' in violation of the fourteenth amendment" to the United States Constitution.[6] *State v. Tyrrell*, 60 Haw. 17, 21–22, 586 P.2d 1028, 1031 (1978) (quoting *Drope*, 420 U.S. at 172, 95 S.Ct. at 904). As the United States Supreme Court recently re-emphasized,

"[c]ompetence to stand trial is rudimentary, for upon it depends the main part of those rights deemed essential to a fair trial, including the right to effective assistance of counsel, the rights to summon, to confront, and to cross-examine witnesses,

---

**6.** The Fourteenth Amendment to the United States Constitution provides, in relevant part, that no state shall "deprive any person of life, liberty, or property, without due process of law[.]"

and the right to remain silent without penalty for doing so. *Drope v. Missouri,* 420 U.S. 162, 171–72 [95 S.Ct. 896, 903–904, 43 L.Ed.2d 103] (1975)."

*Cooper v. Oklahoma,* —— U.S. ——, ——, 116 S.Ct. 1373, 1376, 134 L.Ed.2d 498 (1996) (quoting *Riggins v. Nevada,* 504 U.S. 127, 139–40, 112 S.Ct. 1810, 1817, 118 L.Ed.2d 479 (1992) (opinion concurring in the judgment) (footnote omitted).

In Hawaiʻi, various statutory provisions are in place to protect a defendant's right not to be tried or convicted while incompetent. Pursuant to HRS § 704–403 (1993):

No person who as a result of a physical or mental disease, disorder, or defect lacks capacity to understand the proceedings against the person or to assist in the person's own defense shall be tried, convicted, or sentenced for the commission of an offense so long as such incapacity endures.

HRS § 704–404 (1993) [7] provides that a court may immediately suspend criminal proceedings against a defendant if it has reason

---

7. HRS § 704–404 (1993) provides:

**Examination of defendant with respect to physical or mental disease, disorder, or defect.** (1) Whenever the defendant has filed a notice of intention to rely on the defense of physical or mental disease, disorder, or defect excluding responsibility, or there is reason to doubt the defendant's fitness to proceed, or reason to believe that the physical or mental disease, disorder, or defect of the defendant will or has become an issue in the case, the court may immediately suspend all further proceedings in the prosecution. If a trial jury has been empanelled, it shall be discharged or retained at the discretion of the court. The dismissal of the trial jury shall not be a bar to further prosecution.

(2) Upon suspension of further proceedings in the prosecution, the court shall appoint three qualified examiners to examine and report upon the physical and mental condition of the defendant. In each case the court shall appoint at least one psychiatrist and at least one licensed psychologist. The third member may be either a psychiatrist, licensed psychologist, or qualified physician. One of the three shall be a psychiatrist or licensed psychologist designated by the director of health from within the department of health. The three examiners shall be appointed from a list of certified sanity examiners as determined by the department of health. The court may order the defendant to be committed to a hospital or other suitable facility for the purpose of the examination for a period not exceeding thirty days, or such longer period as the court determines to be necessary for the purpose, and may direct that one or more qualified physicians or psychologists retained by the defendant be permitted to witness and participate in the examination. As used in this section, the term "licensed psychologist" includes psychologists exempted from licensure by section 465–3(a)(3).

(3) In such examination any method may be employed which is accepted by the medical profession for the examination of those alleged to be suffering from physical or mental disease, disorder, or defect; provided that each examiner shall form and render diagnoses and opinions upon the physical and mental condition of the defendant independently from the other examiners, and the examiners may, upon approval of the court, secure the services of clinical psychologists and other medical or paramedical specialists to assist in the examination and diagnosis.

(4) The report of the examination shall include the following:
(a) A description of the nature of the examination;
(b) A diagnosis of the physical or mental condition of the defendant;
(c) An opinion as to the defendant's capacity to understand the proceedings against the defendant and to assist in the defendant's own defense;
(d) An opinion as to the extent, if any, to which the capacity of the defendant to appreciate the wrongfulness of the defendant's conduct or to conform the defendant's conduct to the requirements of law was impaired at the time of the conduct alleged;
(e) When directed by the court, an opinion as to the capacity of the defendant to have a particular state of mind which is required to establish an element of the offense charged; and
(f) A statement that the diagnosis and opinion rendered were arrived at independently of the other examiners, unless there is a showing of a clear need for communication between or among the examiners for clarification. A description of the communication shall be included in the report.

(5) If the examination cannot be conducted by reason of the unwillingness of the defendant to participate therein, the report shall so state and shall include, if possible, an opinion as to whether such unwillingness of the defendant was the result of physical or mental disease, disorder, or defect.

(6) The report of the examination, including any supporting documents, shall be filed in triplicate with the clerk of the court, who shall cause copies to be delivered to the prosecuting attorney and to counsel for the defendant.

to doubt a defendant's fitness to proceed. The statute also provides that when the court suspends the proceedings, it shall appoint a panel of three qualified experts to examine the defendant and report on the defendant's physical or mental condition.

HRS § 704–405 (1993) [8] provides that the trial court shall determine a defendant's fitness to proceed. This section also sets forth the process that a court must follow in making that determination once it has received the HRS § 704–404 panel's report.

Finally, HRS § 704–406 (1985 & Supp. 1986) [9] describes the effect of a court's determination that a defendant is unfit to proceed to trial.

> (7) Any examiner shall be permitted to make a separate explanation reasonably serving to clarify the examiner's diagnosis or opinion.
> (8) The court shall obtain all existing, medical, social, police and juvenile records, including those expunged, and other pertinent records in the custody of public agencies notwithstanding any other statutes, and make such records available for inspection by the examiners.
> (9) The compensation of persons making or assisting in the examination, other than those retained by the nonindigent defendant, who are not undertaking the examination upon designation by the director of health as part of their normal duties as employees of the State or a county, shall be paid by the State.

8. HRS § 704–405 (1993) provides:

> **Determination of fitness to proceed.** When the defendant's fitness to proceed is drawn in question, the issue shall be determined by the court. If neither the prosecuting attorney nor counsel for the defendant contests the finding of the report filed pursuant to section 704–404, the court may make the determination on the basis of such report. If the finding is contested, the court shall hold a hearing on the issue. When the report is received in evidence upon such hearing, the party who contests the finding thereof shall have the right to summon and to cross-examine the persons who joined in the report or assisted in the examination and to offer evidence upon the issue.

9. At the time that Defendant was tried, HRS § 704–406 (1985 & Supp.1986) provided:

> **Effect of finding of unfitness to proceed.** (1) If the court determines that the defendant lacks fitness to proceed, the proceeding against him shall be suspended, except as provided in section 704–407, and the court shall commit him to the custody of the director of health to be placed in an appropriate institution for de-

In *State v. Tyrrell,* 60 Haw. at 22, 586 P.2d at 1032, the Hawai'i Supreme Court, relying on existing United States Supreme Court case law, held that the Due Process Clause of the Fourteenth Amendment to the United States Constitution imposed a "duty" on "the trial court to order *sua sponte* a hearing on competency when what is before it sufficiently indicates that the defendant may be incompetent to stand trial." *Id.* at 22, 586 P.2d at 1032 (citations omitted).

The supreme court also concluded, despite the seemingly mandatory language in HRS § 704–404(2) that a panel of three examiners "shall" be appointed whenever

> tention, care, and treatment. If the court is satisfied that the defendant may be released on condition without danger to himself or to the person or property of others, the court shall order his release, which shall continue at the discretion of the court, on such conditions as the court determines necessary. A copy of the report filed pursuant to section 704–404 shall be attached to the order of commitment or order of conditional release.
> (2) When the court, on its own motion or upon the application of the director of health, the prosecuting attorney, or the defendant, determines, after a hearing if a hearing is requested, that the defendant has regained fitness to proceed, the penal proceeding shall be resumed. If, however, the court is of the view that so much time has elapsed since the commitment or conditional release of the defendant that it would be unjust to resume the proceeding, the court may dismiss the charge and may order the defendant to be discharged or, subject to the law governing the involuntary hospitalization or conditional release of persons suffering from physical or mental disease, disorder, or defect, order the defendant to be committed to the custody of the director of health to be placed in an appropriate institution for detention, care, and treatment or order the defendant to be released on such conditions as the court determines necessary.
> (3) Within a reasonable time following any commitment under subsection (1), the director of health shall report to the court whether or not the defendant presents a substantial likelihood of becoming fit to proceed in the future. If, following such a report, the court determines that the defendant will probably remain unfit to proceed, the court may dismiss the charge and release the defendant or subject the defendant to involuntary civil commitment procedures.

HRS § 704–406 was subsequently amended by Act 87, 1993 Haw.Sess.Laws 120.

"there is reason to doubt the defendant's fitness to proceed," that, based on the legislative intent behind the statute, the decision to impanel a board of examiners in a particular case "rests in the sound discretion of the [trial] court." *Id.* at 21, 586 P.2d at 1031. Therefore, even if a trial court has reason to doubt a defendant's fitness to proceed, it is not statutorily required to impanel a board of examiners to examine and report on a defendant's competence to stand trial. Moreover, the failure to impanel a board does not violate the defendant's due process rights where the defendant has been found competent by a single psychiatrist and the indicia of the defendant's incompetency was weak. *Id.* at 23–24, 586 P.2d at 1032–33.

In this case, the trial court apparently determined that sufficient indicators were not present to raise a reasonable doubt of Defendant's competence to stand trial, since it did not conduct a *sua sponte* hearing on the issue. The trial court also concluded that Defendant was competent to proceed to trial.

Two issues relevant to Defendant's competence to proceed to trial are thus presented by this appeal: (1) whether the trial court erred in failing to conduct a hearing on Defendant's competency; and (2) whether the trial court erred in concluding that Defendant was competent to be tried.

### 2. The Trial Court's Failure to Conduct a Hearing on Defendant's Competency

■ No consistency exists among appellate courts regarding the proper standard to apply in reviewing a trial court's failure to conduct a hearing on a defendant's competence to stand trial. Some courts apply the abuse of discretion standard. *People v. Jackson,* 57 Ill.App.3d 809, 15 Ill.Dec. 237, 240, 373 N.E.2d 583, 586 (1978); *Dutton v. State,* 674 P.2d 1134 (Okla.Cr.App.), *cert. denied,* 467 U.S. 1256, 104 S.Ct. 3548, 82 L.Ed.2d 850 (1984). Others apply the clearly erroneous standard, *Stolarz v. Indiana,* 445 N.E.2d 114, 117 (Ind.App.1983), or the *de novo* standard, *De Kaplany v. Enomoto,* 540 F.2d 975, 983 (9th Cir.1976), *cert. denied,* 429

U.S. 1075, 97 S.Ct. 815, 50 L.Ed.2d 793 (1977).

In *State v. Tyrrell,* 60 Haw. at 22, 586 P.2d at 1032, the Hawai'i Supreme Court, in discussing the trial court's duty to order *sua sponte* a competency hearing when what is before it sufficiently indicates that the defendant may be incompetent to stand trial, stated that "[w]here there is no dispute as to the relevant evidence before the trial court, it is for the reviewing court to determine what inferences are to be drawn from the undisputed facts and whether further inquiry into the defendant's competence was required." This statement suggests that *de novo* review is the appropriate standard to apply in evaluating whether, based on the evidence in the record, a hearing on Defendant's competence was required.

■ Under the *de novo* standard, the question on appeal is whether, based on our review of the record, sufficient indicators were present at trial such that a reasonable judge standing in the shoes of the trial judge whose failure to conduct an evidentiary hearing is being reviewed, should have experienced a good faith doubt as to Defendant's competence to stand trial. *De Kaplany v. Enomoto,* 540 F.2d at 983. The fact that conflicting evidence was before the trial court so as to create a doubt about Defendant's competency does not necessitate a hearing. *Id.* at 982. "Genuine doubt, not a synthetic or constructive doubt, is the measuring rod. The emergence of genuine doubt in the mind of a trial judge necessarily is the consequence of his total experience and his evaluation of the testimony and events of the trial." *Id.* at 982–83.

In *State v. Tyrrell, supra,* defense counsel raised the issue of his client's mental competency prior to trial. In a supporting affidavit, defense counsel stated his belief that the defendant was mentally disturbed and reported that the defendant had been treated at mental health clinics for a chronic alcoholic problem, that a jail counselor had observed instances of the defendant's irrational behavior, and that the police investigation indicat-

ed that the defendant may have acted under extreme emotional distress. In response, the trial court ordered that the defendant be examined by a state-employed psychiatrist, who subsequently reported that, in his opinion, the defendant neither demonstrated any indication of mental defect or disorder which would affect his criminal responsibility nor lacked any substantial capacity to understand the proceedings against him and to assist in his own defense. The supreme court held, under these circumstances, that sufficient indicators of the defendant's lack of competency at trial were not present to require a hearing on the issue. In the court's view, the receipt of the psychiatrist's report terminated any due process requirement that the court proceed with the inquiry. *Id.* at 23–24, 586 P.2d at 1032–33.

 In this case, the record indicates that when defense counsel raised the issue of Defendant's competency on the third day of trial, five psychiatric assessments and two judicial determinations of Defendant's competence to stand trial had already been made. The trial court also extensively questioned Defendant and was able to evaluate Defendant's demeanor and conduct in the courtroom. If the foregoing had been the only relevant evidence before the trial court, we would not hesitate to conclude that a reasonable judge in the trial judge's shoes would not have entertained a good faith doubt that Defendant's mental condition had deteriorated since his prior competency hearings so as to render Defendant incompetent at the time of trial. Accordingly, under *Tyrrell*, no due process duty would have been imposed on the trial judge to suspend proceedings, to appoint another expert or panel of experts to evaluate Defendant's competency, and to conduct an evidentiary hearing on Defendant's competency. *See also Buhring v. State*, 453 N.E.2d 228, 231 (Ind.1983)

("When there has been a determination of competency to stand trial and there is no event or occurrence subsequent to that determination to indicate a change in a defendant's mental condition, an additional hearing on competency is not required.").

What is troubling in this case, however, is that Defendant asserted that he had missed his morning appointment to receive his regular prolixin shot. Drs. Ko and Schramel had earlier opined that Defendant presented no risk to others as long as he saw his psychiatrist regularly, avoided substance abuse, and continued his medication. It is not clear from the record whether Defendant required the medication in order to be mentally competent to proceed to trial. However, in view of Defendant's assertion, as well as his trial counsel's representations that Defendant was acting completely differently from the first day of trial, we conclude that a good faith doubt was clearly raised as to whether Defendant's failure to take his medication was directly affecting his legal competence to stand trial.

Therefore, the trial court should have *sua sponte* suspended trial proceedings in order to conduct an evidentiary hearing on Defendant's competence at that time to stand trial.[10] Since it failed to do so, we must vacate Defendant's conviction. Because the passage of time has rendered impractical a remand for an after-the-fact hearing on Defendant's competency at the time of trial, we remand the case to the circuit court for a new hearing on Defendant's present competence to proceed to trial, and for a new trial if Defendant is found competent under the legal standards articulated in this opinion. *See Dusky v. United States*, 362 U.S. 402, 403, 80 S.Ct. 788, 789, 4 L.Ed.2d 824 (1960); *Pate v. Robinson*, 383 U.S. at 387, 86 S.Ct. at 843.

Although the foregoing conclusion effectively disposes of this appeal, we believe it

---

**10.** Since the issue was not raised by the parties, we decline to address whether a defendant whose mental competency at the time of trial rests on continued medication during trial can ever be tried. We note, however, that the American Bar Association has recommended procedures to safeguard the fairness of trial proceedings under such circumstances, if such proceedings are assumed proper. *See* 2 American Bar Association Standards for Criminal Justice, Mental Health Standards (ABA Criminal Justice Mental Health Standards), Standard 7-4.14 (2d ed. 1986 Supp.).

necessary to address the remaining issues raised by Defendant since they are likely to recur on remand or in other cases involving a mentally impaired defendant.

### 3. The Trial Court's Determination of Defendant's Competence to Stand Trial

### a. The Appellate Standard of Review

Most appellate courts have adopted the abuse of discretion standard for reviewing a trial court's determination that a defendant was competent to stand trial. *See, e.g., Buhring v. State,* 453 N.E.2d 228 (Ind.1983); *State v. Perkins,* 248 Kan. 760, 811 P.2d 1142 (1991); *State v. Statczar,* 228 Mont. 446, 743 P.2d 606, 613 (1987); *Siah v. State,* 837 P.2d 485, 487 (Okla.Cr.App.1992); *State v. Ortiz,* 104 Wash.2d 479, 706 P.2d 1069, 1071 (1985), *cert. denied,* 476 U.S. 1144, 106 S.Ct. 2255, 90 L.Ed.2d 700 (1986).

We choose, however, to apply the two-part standard of review utilized by the Tenth Circuit Court of Appeals in *Lafferty v. Cook,* 949 F.2d 1546 (10th Cir.1991), *cert. denied,* 504 U.S. 911, 112 S.Ct. 1942, 118 L.Ed.2d 548 (1992). Under this standard, the appellate court must initially assess whether the trial court made its competency determination based on a correct legal standard. *Id.* at 1550. This is a question of law subject to *de novo* review:

> Because competency to stand trial is an aspect of substantive due process, the legal standard by which competency is to be evaluated is constitutionally mandated. Accordingly, the components of that standard, required as they are by the Constitution, do not vary according to the views of a particular court. The Constitution can require but one gauge against which to determine whether, because of his mental condition, a defendant's due process rights

are violated by requiring him to stand trial. The content of the standard of competency is therefore a question of law which we review de novo.

*Id.* (internal citations omitted). If the trial court evaluated a defendant's competency by the correct standard, the second inquiry on appellate review is whether the trial court's determination of a defendant's competency is fairly supported by the record of the proceeding at which the determination was made. *Id.* In other words, the substantial evidence standard of review governs the second inquiry.

### b. The Test for Determining Defendant's Competence to Stand Trial

Applying the two-part standard of review, we initially examine whether the trial court determined Defendant's competence to stand trial under the correct legal standard.

The fact that a defendant has been diagnosed as mentally ill or emotionally unstable to some degree does not necessarily mean that the defendant is incompetent to stand trial. *United States v. Horowitz,* 360 F.Supp. 772, 777 (E.D.Penn.1973) (citations omitted). Similarly, a defendant's agitated behavior or verbose, rambling, and inappropriate remarks at trial do not automatically raise doubts as to the defendant's competence to stand trial. *United States v. Rowe,* 638 F.2d 1100, 1103–04 (7th Cir.1981); *Stolarz v. State,* 445 N.E.2d 114, 117 (Ind.App. 1983); *Commonwealth v. Hall,* 15 Mass.App. Ct. 1, 443 N.E.2d 121, 122–23 (1982).

According to the United States Supreme Court, the test (hereinafter, the Dusky/Drope test) for determining whether a criminal defendant is legally competent to proceed to trial is three-fold.[11]

First, the trial court must determine whether the defendant "has sufficient pres-

---

11. The test established by HRS § 704–403 for determining a defendant's legal competence to proceed to trial is slightly different from the Dusky/Drope test. Under HRS § 704–403, the crucial inquiry is whether, as a result of a physical or mental disease, disorder, or defect (1) the defendant lacks capacity to understand the proceedings against him or her, and (2) the defendant lacks capacity to assist in his or her own defense. Unlike the Dusky/Drope test, HRS § 704–403 requires that the defendant's legal incompetence result from a physical or mental disease, disorder, or defect. Additionally, HRS

ent ability to consult with his [or her] lawyer with a reasonable degree of rational understanding[.]" *Dusky v. United States*, 362 U.S. at 402, 80 S.Ct. at 789. Second, the trial court must determine whether a defendant has "the capacity ... to assist in preparing his [or her] defense[.]" *Drope v. Missouri*, 420 U.S. at 171, 95 S.Ct. at 903. Third, the trial court must determine whether the defendant "has a rational as well as factual understanding of the proceedings against him [or her]." *Dusky* at 402, 80 S.Ct. at 789.

 To apply the foregoing test, the trial court must assess a defendant's ability to develop a working relationship with his or her attorney, provide the attorney with information that can be used to present a coherent defense, make fundamental defense decisions, testify in court, if necessary, and withstand the pressures of a trial. *United States v. Horowitz*, 360 F.Supp. at 777; *State v. Hamilton*, 373 So.2d 179, 182 (La. 1979); *People v. Swallow*, 60 Misc.2d 171, 301 N.Y.S.2d 798 (N.Y.App.Div.1969). In this regard:

> The decision as to a defendant's competency to stand trial should not turn solely upon whether he [or she] suffers from a mental disease or defect, but must be made with specific reference to the nature of the charge, the complexity of the case and the gravity of the decisions with which he [or she] is faced.... Appropriate considerations in determining whether the accused is fully aware of the nature of the proceedings include: whether he [or she] understands the nature of the charge and

can appreciate its seriousness; whether he [or she] understands what defenses are available; whether he [or she] can distinguish a guilty plea from a not guilty plea and understand the consequences of each; whether he [or she] has an awareness of his [or her] legal rights; and whether he [or she] understands the range of possible verdicts and the consequences of conviction. Facts to consider in determining an accused's ability to assist in his [or her] defense include: whether he [or she] is able to recall and relate facts pertaining to his [or her] actions and whereabouts at certain times; whether he [or she] is able to assist counsel in locating and examining relevant witnesses; whether he [or she] is able to maintain a consistent defense; whether he [or she] is able to listen to the testimony of witnesses and inform his [or her] lawyer of any distortions or misstatements; whether he [or she] has the ability to make simple decisions in response to well-explained alternatives; whether, if necessary to defense strategy, he [or she] is capable of testifying in his [or her] own defense; and to what extent, if any, his [or her] mental condition is apt to deteriorate under the stress of trial.

*State v. Hamilton*, 373 So.2d at 182 (quoting *State v. Bennett*, 345 So.2d 1129, 1138 (La. 1977)).

The Commentary to American Bar Association Standards for Criminal Justice, Mental Health Standards (ABA Criminal Justice Mental Health Standards) Standard 7–4.1(b) (2d ed. 1986 Supp.),[12] which incorporates the Dusky/Drope test, suggests that when apply-

---

§ 704–403 omits the Dusky/Drope requirement that the defendant have "sufficient present ability to consult with his [or her] lawyer with a reasonable degree of rational understanding," *Dusky v. United States*, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960), although arguably, this requirement is encompassed within the requirement that the defendant be capable of assisting in his or her own defense. To the extent that the protections afforded to a defendant are greater under the three-part Dusky/Drope standard, the standard enunciated by the United States Supreme Court, rather than the statutory test set forth in HRS § 704–403, should be applied in proceedings to determine a defendant's legal competence to proceed to trial.

**12.** ABA Criminal Justice Mental Health Standards Standard 7–4.1 provides, in pertinent part:

Mental incompetence to stand trial; rules and definitions.

(a) No defendant shall be tried while mentally incompetent to stand trial.

(b) The test for determining mental competence to stand trial should be whether the defendant has sufficient present ability to consult with defendant's lawyer with a reasonable degree of rational understanding and otherwise to assist in the defense, and whether the defendant has a rational as well as factual understanding of the proceedings.

The Commentary to Standard 7–4.1(b) notes that the test for incompetence to stand trial is "taken virtually verbatim" from the *Dusky* and *Drope* decisions.

ing the Dusky/Drope test, the trial court should focus on a particular defendant's functional skills in five areas:

1. Defendants should have a perception of the process not distorted by mental illness or disability. Whether phrased in terms of (a) an ability to perceive rationally and without distortion, (b) an "understanding" of the process, or (c) an "awareness" of the charge and possible verdicts, or (d) couched in a codified requirement that defendants understand that there is a judge on the bench, a prosecutor who will try to convict, and defense counsel who will defend against criminal charges, the thrust of the requirement is that defendants understand the nature of the process and their functions as participants within that process free from undue perceptual distortion.

2. Defendants require a capacity to maintain the attorney-client relationship, embracing an ability to discuss the facts of a case with counsel "without paranoid distrust," to advise and accept advice from counsel, to elect an appropriate plea, and to approve the legal strategy of the trial. The relationship requires an ability to consult rationally about a pending case which is something more than a superficial capacity to converse with others.

3. A third requirement, somewhat akin to the second, bears on the ability to recall and relate factual information. If a primary purpose of the prohibition against trying incompetent defendants is to preserve accuracy in factfinding, then defendants must be able to recall and relate factual occurrences. If they are not, they cannot reveal exonerating circumstances to their attorneys. This requirement has been variously phrased: that a defendant have "sufficient memory to relate answers to questions posed" to him or her, that "he [or she] can follow the testimony reasonably well," and that there be a

"capacity to realistically challenge prosecution witnesses." Without that capacity, defendants realistically are unable to exercise the rights to consult with counsel, testify in personal defense, and confront accusers.

4. Defendants should be capable of testifying in personal defense if that should prove appropriate.

5. A final factor is a defendant's abilities to meet the competency criteria in the setting of the particular charges, the extent of the defendant's needed participation in trial proceedings, and the complexity of the case. Therefore, an evaluator should consider a defendant's mental ability in relation to the severity of the charge and the complexity of the case.

*Id.* (footnotes omitted).

■ In this case, it is not clear from the record what factors the trial court considered in determining that Defendant was competent to proceed to trial. The record does reveal, however, that the court's questioning of Defendant did not focus on the Dusky/Drope standards but was devoted mainly to determining whether Defendant had a "clear mind," free of alcohol and drugs.

Moreover, although the psychiatrists and psychologists who examined Defendant reported that he was able to understand the proceedings and to assist in his defense, they did not provide any factual bases for their opinions and were never called to explain their opinions at either of the two competency hearings held prior to trial.

Under these circumstances, we are not convinced that the trial court evaluated Defendant's competence to stand trial under the proper legal standard.

### B. *Defendant's Request for Substitute Counsel and Defense Counsel's Motions to Withdraw*

#### 1. *The Dilemmas Facing the Attorney Representing a Mentally Impaired Defendant*

This case highlights the unavoidable difficulties which a criminal defense attorney

faces in defending a mentally impaired defendant, a situation that has been described as "ethical quicksand." P. Chernoff & W. Schaffer, *Defending the Mentally Ill: Ethical Quicksand,* 10 Am.Crim.L.Rev. 505 (1972). As Professor Rodney Uphoff points out, a myriad of dilemmas face a criminal defense lawyer representing a mentally impaired defendant:

> In the normal lawyer-client relationship, the lawyer is called upon to establish a relationship of trust and confidence founded on the lawyer's pledge of confidentiality. Reassured by this pledge, the client relates facts to defense counsel and listens to counsel's advice. A criminal defense lawyer has a clear duty to consult with [his or] her client and to keep that client informed of case developments. As a trusted counselor, the lawyer's role is to assist the client in making informed decisions about the case, not to unilaterally decide what is in the client's best interest. Although authorities disagree as to whose decision should control in certain matters, the criminal defendant clearly is to make all fundamental case decisions.

> A criminal defense lawyer representing a mentally impaired client, however, may find it difficult to establish a normal lawyer-client relationship. The difficulties frequently begin at the initial meeting between lawyer and client. Defendants may be hostile, abusive and physically threatening, or they may sit silently, totally unresponsive to any inquiries. Some defendants babble incoherently. Others intermittently talk sense and then nonsense. Whatever the nature of the problem, the lawyer's inability to engage the defendant in a normal lawyer-client colloquy creates tension in the relationship.

> Communication difficulties raise other concerns for defense counsel. The lawyer may be unsure whether the client appreciates the pledge of confidentiality or understands that the lawyer is serving as the client's advocate. Defense counsel may be uncertain whether the client trusts [him or] her. Thus, even if the client is capable

of talking about the facts of the case, the lawyer may be wary of relying on the client as a source of information. Moreover, the lawyer may be unsure whether the client understands any of the advice or information the lawyer is giving. If the client cannot process information or understand the lawyer's advice, then he [or she] may not be able to weigh options intelligently and make informed decisions. The client's inability to make informed fundamental decisions forces defense counsel to assume decisionmaking responsibility for the client or to raise the issue of the client's competency..

> To be competent, a defendant must have "sufficient present ability to consult with his [or her] lawyer with a reasonable degree of rational understanding ... and ... a rational as well as a factual understanding of the proceedings against him [or her]." Clearly, many mentally ill defendants are legally competent to stand trial. Despite their mental illness, such clients can interact adequately with defense counsel and possess a sufficient understanding of the proceedings. If, however, defense counsel finds that the defendant's mental impairment is impinging upon the lawyer-client relationship or causing [him or] her to doubt the client's understanding of the proceedings, counsel must carefully consider the competency issue.

> Careful consideration of the issue may, nonetheless, leave defense counsel in a confusing bind. The lawyer may recognize that the defendant's mental condition is adversely affecting the lawyer-client relationship and the client's decisionmaking ability. Thus, the mentally impaired client may be making very poor decisions or be unable to decide at all. Committed to the principle of client decisionmaking, counsel may find it difficult to respect the choices, particularly irrational ones, of an impaired decisionmaker. In practice, many lawyers are reluctant to permit an impaired client to make harmful decisions.

> This reluctance stems from defense counsel's loyalty to the "man [or woman] in

trouble," [his or] her desire to secure a favorable disposition for the client, a commitment to challenging the State's case and [his or] her sense of professional worth. Further, the uncertain nature of the decision or of the process the client used to reach that decision may deter counsel from following a client's harmful decision. As the client's irrationality becomes more pronounced, the lawyer feels pressure either to assume a more paternalistic role or to raise the issue of the client's competency.

Raising competency, however, may have serious costs for the defendant. Competency evaluations are usually done on an inpatient basis and may lead to lengthy hospitalization. This hospitalization usually takes place in a maximum-security institution with minimum treatment. Such hospitalization is often unnecessary and unduly stigmatizing. Additionally, prolonged hospitalization may jeopardize the defendant's right to a fair trial. For many defendants, particularly those charged with minor offenses, raising competency subjects the defendant to a far greater deprivation of his liberty than if he [or she] were convicted of the crime with which he [or she] is charged.

Given their client-above-all perspective, most defense lawyers will balk at taking action against their clients' interests. Hence, many lawyers will be reluctant to raise competency if they believe that doing so will be detrimental to their clients. This is especially true if the client also expresses a clear desire not to raise the competency issue. Moreover, raising competency may require the lawyer to disclose confidential communications and destroy an already fragile lawyer-client relationship. While in some cases the severity of the client's impairment dictates that the issue be raised, in many other cases the lawyer is under strong pressure not to raise competency.

R. Uphoff, *The Role of the Criminal Defense Lawyer in Representing the Mentally Impaired Defendant: Zealous Advocate or Offi-*

*cer of the Court,* 1988 Wis.L.Rev. 65, 68–72 (footnotes omitted).

If the attorney's defense of a defendant results in an adverse judgment, the difficulties faced by a defense attorney may be further exacerbated since, in such instances, the defendant will frequently challenge on appeal, or by a habeas corpus petition, the effectiveness of his or her trial counsel.

In this case, it is evident from the trial transcripts that the relationship between Defendant and his trial counsel was seriously strained. Although trial counsel represented to the court that Defendant had agreed, prior to trial, to rely on a self-defense strategy, it appears from the record that Defendant was not satisfied with this trial strategy. Indeed, Defendant complained several times to the trial court that his trial counsel had not bothered to probe into Defendant's prior psychiatric history. Defendant's distrust of or disagreement with his attorney resulted in a refusal to communicate with his attorney and a refusal to testify at trial, despite his attorney's advice that such testimony was crucial to the self-defense strategy.

Based on the foregoing circumstances, Defendant contends that he was entitled to substitute counsel and that his attorney should have been allowed to withdraw.

2. *Requirements for Evaluating a Criminal Defendant's Entitlement to Substitute Counsel and Defense Counsel's Request to Withdraw*

■ There is, however, no absolute right on the part of an indigent criminal defendant to a change in court-appointed counsel. *State v. Torres,* 54 Haw. 502, 504, 510 P.2d 494, 496 (1973). As one court has recognized, "certain restraints must be put on the reassignment of counsel lest the right be 'manipulated so as to obstruct the orderly procedure in the courts or to interfere with the fair administration of justice.'" *McKee v. Harris,* 649 F.2d 927, 931 (2d Cir.1981) (quoting *United States v. Bentvena,* 319 F.2d 916, 936 (2d Cir.), *cert. denied,* 375 U.S. 940,

84 S.Ct. 345, 11 L.Ed.2d 271 (1963)), *cert. denied*, 456 U.S. 917, 102 S.Ct. 1773, 72 L.Ed.2d 177 (1982).

 Whether a change in counsel should be permitted, therefore, rests in the sound discretion of the trial court, *State v. Ahlo*, 2 Haw.App. 462, 469, 634 P.2d 421, 426 (1981), *cert. denied*, 456 U.S. 981, 102 S.Ct. 2252, 72 L.Ed.2d 858 (1982), and a trial court's decision in this regard will not be overturned on appeal unless "there [has been] an abuse of discretion that prejudiced the defendant by amounting to an unconstitutional denial of the right to *effective* assistance of counsel." *Torres*, 54 Haw. at 505, 510 P.2d at 496 (emphasis in original).

 The Hawai'i Supreme Court has instructed that when an indigent defendant requests that his or her appointed counsel be replaced, the trial court has a duty to conduct a "penetrating and comprehensive examination" of the defendant on the record, in order to ascertain the bases for the defendant's request. *State v. Kane*, 52 Haw. 484, 487–88, 479 P.2d 207, 209 (1971). This inquiry is necessary to protect "the defendant's right to effective representation of counsel[,]" *id.*, and must be sufficient to enable the court to determine if there is good cause to warrant substitution of counsel. *Brown v. Craven*, 424 F.2d 1166, 1169–70 (9th Cir.1970); *People v. Marsden*, 2 Cal.3d 118, 84 Cal.Rptr. 156, 159–160, 465 P.2d 44, 47–48 (1970); *People v. Arguello*, 772 P.2d 87, 94 (Colo.1989); *State v. Bronson*, 122 Or.App. 493, 858 P.2d 467, 469 (1993).

 There is no mechanical test for determining whether good cause exists which would warrant the appointment of substitute counsel for an indigent defendant, and each case must therefore be evaluated on its particular circumstances, *Commonwealth v. Nicolella*, 307 Pa.Super. 96, 452 A.2d 1055, 1057 (1982), applying an objective standard. *McKee v. Harris*, 649 F.2d 927, 932 (2d Cir. 1981) (rejecting defendant's suggestion that good cause be determined solely according to the subjective standard of what defendant perceives since applying such a standard would convert the requirement of good cause into an empty formality and entitle defendant to demand reassignment of counsel simply on the basis of a "breakdown in communication" defendant himself or herself adduced), *cert. denied*, 456 U.S. 917, 102 S.Ct. 1773, 72 L.Ed.2d 177 (1982).

Some courts have held, however, that good cause may be found where a conflict of interest exists on the part of defense counsel, or where there is a complete breakdown in communication or irreconcilable conflict between a defendant and his or her counsel which leads to an apparently unjust verdict. *United States v. Welty*, 674 F.2d 185 (3d Cir. 1982); *McKee v. Harris*, 649 F.2d 927 (2d Cir.1981); *United States v. Calabro*, 467 F.2d 973, 986 (2d Cir.1972), *cert. denied*, 410 U.S. 926, 93 S.Ct. 1358, 35 L.Ed.2d 587 (1973); *State v. LaGrand*, 152 Ariz. 483, 486, 733 P.2d 1066, 1069, *cert. denied*, 484 U.S. 872, 108 S.Ct. 206, 98 L.Ed.2d 157 (1987); *State v. Haynes*, 118 Wis.2d 21, 345 N.W.2d 892 (Wis. App.1984).

 If the court finds that "good cause" exists for a defendant to discharge his or her counsel, it should appoint substitute counsel and provide the defendant with adequate time to prepare a defense. *Williams v. Florida*, 427 So.2d 768, 770 (Fla.App.1983). If no valid reason for discharge appears, or the defendant does not state a reason, the trial court should advise the defendant that the court is not required to appoint substitute counsel to represent the defendant if the defendant's original counsel is discharged. *Id.* If after being so advised, the defendant continues to demand substitution of his or her court-appointed counsel, the trial court may, in its discretion, discharge counsel and require the defendant to proceed to trial without representation. *Id.; see also State v. Char*, 80 Hawai'i 262, 909 P.2d 590 (App. 1995) (in criminal cases, an indigent defendant is deemed to have voluntarily waived his or her right to the services of court-appointed counsel if (1) the defendant requested substitute court-appointed counsel; (2) the

defendant was afforded a reasonable opportunity to show good cause for substitute counsel; (3) the trial court did not abuse its discretion when it decided that a substitute court-appointed counsel was not warranted; (4) the requirements of *State v. Dickson*, 4 Haw.App. 614, 619–20, 673 P.2d 1036, 1041 (1983), were satisfied; (5) the defendant was given a clear choice of either continuing with present counsel or being deemed to have waived by conduct his or her right to counsel; and (6) the defendant refused to continue with present counsel).

### 3. *Application of the Requirements to This Case*

▮ The record in this case reveals that when the trial court denied Defendant's request to substitute his appointed counsel, as well as defense counsel's motions to withdraw, the trial court improperly failed to conduct the evidentiary hearing required by *Kane*. Consequently, this court is unable to evaluate the merits of Defendant's claim that his constitutional right to effective assistance of counsel was prejudiced when the trial court denied his request for substitute counsel.

It appears from the record, however, that part of Defendant's dissatisfaction with his trial counsel stemmed from his disagreement over the appropriate defense strategy to pursue at trial. Although trial counsel claimed that, prior to the commencement of trial, Defendant had agreed to rely on a self-defense strategy at trial, Defendant apparently had changed his mind and wanted to rely on a mental irresponsibility defense by the time trial actually commenced.

▮ As indicated above, the inability of a defendant to maintain a consistent defense is one of the indicators that the defendant may be mentally incompetent to proceed to trial.

*See, supra*, III.A.3.b. Assuming a defendant is competent, however, certain principles must govern a trial court's determination of whether differences of opinion between a defendant and his or her attorney regarding trial strategy constitute good cause, warranting the appointment of substitute counsel.

▮ As a general rule, lawyers are permitted broad latitude to make on-the-spot strategic choices in the course of trying a case, and a defense counsel's tactical decisions at trial will not be questioned by a reviewing court. *State v. Antone*, 62 Haw. 346, 352, 615 P.2d 101, 106 (1980). *See also Briones v. State*, 74 Haw. 442, 463, 848 P.2d 966, 977 (1993) ("[a]n informed, tactical decision will rarely be second-guessed by judicial hindsight").

▮ However, a defense counsel's freedom to make strategic decisions is not without limits. *Antone*, 62 Haw. at 352, 615 P.2d at 106. There are certain defense decisions which must be made by the defendant, rather than defense counsel. For example, the defendant retains the ultimate authority for making decisions involving "fundamental rights," such as whether to plead guilty, waive a jury, testify in his or her own behalf, take an appeal, or with some limitations, act as his or her own advocate. *Jones v. Barnes*, 463 U.S. 745, 751, 103 S.Ct. 3308, 3312, 77 L.Ed.2d 987 (1983). *See also Tachibana v. State*, 79 Hawai'i 226, 900 P.2d 1293 (1995) (basic decisions such as whether to plead guilty, waive a jury, or testify in one's own behalf are ultimately for the defendant to make and may not be waived by counsel as a matter of trial strategy).

▮ Indeed, where such fundamental rights are involved, there is an *ethical* obligation imposed on defense counsel by Hawai'i Rules of Professional Conduct Rule 1.2(a) (1995) [13] to advise the defendant of the

---

13. Rule 1.2(a) of the Hawai'i Rules of Professional Conduct (1995), entitled "Scope of Representation," provides:

A lawyer shall abide by a client's decisions concerning the objectives of representation, ... and shall consult with the client as to the

means by which the objectives are to be pursued.... *In a criminal case, the lawyer shall abide by the client's decision, after consultation with the lawyer, as to* a plea to be entered, whether to waive jury trial, and *whether the client will testify."*
(Emphases added.)

available defenses and to abide by the defendant's choice regarding these fundamental decisions.

■ No bright line rule exists for determining what other trial decisions are subject to a defendant's, rather than defense counsel's, control. Professors LaFave and Israel have suggested, however, that some of the factors that should be weighed in making this determination include the following:

(1) the significance of the strategic considerations involved balanced against the fundamental nature of the defendant's rights also involved;

(2) the need to administer efficiently the litigation process to ensure, for example, that defense counsel has authority to make the hundreds of quick decisions that must be made during the course of trial, and that the trial court can document, on the record, that decisions subject to the defendant's control were actually made by the defendant;

(3) the probability that the defendant's interest in the particular decision encompasses concerns that extend beyond simply presenting a successful defense, since a defendant should be able to control the "end" objective of the trial and the lawyer should determine the "means" for achieving that end; and

(4) the position in which defense counsel will be placed professionally if required to abide by the defendant's wishes. 2 W. LaFave & J. Israel, *Criminal Procedure* § 11.6 at 60–62 (1984).

In this case, for example, a decision by Defendant as to whether to proceed with a self-defense or a mental irresponsibility theory at trial may require Defendant to evaluate whether he wishes to testify at trial in his own behalf, since reliance on the self-defense theory may be unsuccessful without his testimony. Additionally, it may be necessary for Defendant to consider what outcome he desires from the trial, since a successful mental irresponsibility defense may result in Defendant's confinement to a mental institution

and possible treatment for his alcohol and substance abuse problems, HRS § 704–411 (1985 & Supp.1992), whereas a successful self-defense strategy may result in acquittal or conviction of a lesser included charge and no confinement.

■ Where, as in this case, a defendant's mental competence to proceed to trial has been raised, it is especially important that the trial court conduct a thorough *Kane* inquiry before determining the defendant's request for substitute counsel or defense counsel's motion to withdraw. The trial court is in the best position to ensure that the defendant understands the fundamental decisions that he or she must make and the consequences that can flow from such decisions, and that the defendant has the competence to make such decisions. Appropriate questioning by the trial court will protect the integrity of the criminal justice process by respecting the defendant's autonomy to make such fundamental decisions, while at the same time protecting the defendant from being tried if incompetent. This inquiry also will ensure that an adequate record is available in case effective assistance of counsel claims are litigated on appeal.

## IV. CONCLUSION

Based on the foregoing reasons, we vacate the December 4, 1992 Judgment of the First Circuit Court and remand the case to the First Circuit Court for a new hearing on Defendant's present competence to proceed to trial, and for a new trial if Defendant is found competent.