5 P.3d 444

**STATE of Hawai'i, Plaintiff–Appellee,**

**v.**

**Bryan CASTRO, Defendant–Appellant.**

**No. 21482.**

Intermediate Court of Appeals of Hawai'i.

May 10, 2000.

As Amended May 25, 2000.

Certiorari Granted June 13, 2000.

Joseph R. Mottl III, on the briefs, Honolulu, for Defendant–Appellant.

Alexa D.M. Fujise, Deputy Prosecuting Attorney, on the briefs, City and County of Honolulu, for Plaintiff–Appellee.

BURNS, C.J., WATANABE and ACOBA, JJ.

Opinion of the Court by BURNS, C.J.

Defendant–Appellant Bryan Castro (Castro) appeals the circuit court's March 24, 1998 Judgment, Guilty Conviction and Sentence (March 24, 1998 Judgment), based on a jury verdict, convicting him of Sexual Assault in the Second Degree, Hawai'i Revised Statutes (HRS) § 707–731(1)(a) (Supp.1996), and sentencing him to a term of imprisonment for ten years to be served concurrently with the term of imprisonment imposed in Cr. No. 97–0764. Sexual Assault in the Second Degree is a class B felony. HRS § 707–731(2) (1993). We vacate the March 24, 1998 Judgment, reverse the October 21, 1997 Order Denying Motion for Mental Examination of Defendant, and remand for further proceedings consistent with this opinion.

## BACKGROUND

For approximately one or two months, the complaining witness (CW) and Castro were friends. During that time, Castro was a frequent visitor at CW's house, which CW occupied with her four children and her mother. Castro was able to enter the house via the front door when it was unlocked or via the sliding door located in the rear of the house, which was usually left open or unlocked.

Castro would also go to the house to shower and to sleep. CW's mother testified that Castro would come over and sleep "[k]ind of often" and that "usually he sleeps in the girls' room." At times, CW would give Castro a ride when he needed to go somewhere. Castro voluntarily made gift and cash contributions to CW. CW testified that although Castro wanted to have a romantic relationship with her, that she did not, and they never had a physical relationship. In contrast, Castro testified that he and CW had a consensual physical relationship.

CW testified that on November 7, 1996, after a long night out drinking, at "almost 5:00" a.m., she went to bed together with her ten-year-old daughter and twenty-month-old daughter. She fell asleep wearing her jeans and bra. When she awoke, she was naked, a naked Castro was lying on top of her and his penis was in her vagina, and her ten-year-old daughter was not in the room. CW told Castro to "[g]et the 'f' off of [her]." CW did not report the incident to the police until November 18, 1996, after discussing the incident with her mother, the father of her baby, close friends, and a volunteer at the Sex Abuse Treatment Center. Castro was indicted on March 6, 1997, for Sexual Assault in the Second Degree and was apprehended on March 21, 1997, pursuant to a warrant.

CW's mother confirmed the facts of Castro's entry into CW's room after CW went to bed, his removal of CW's ten-year-old daughter from the bedroom to the living room, and his being on the bed with CW. She also testified that "[Castro] liked [CW], but [CW] didn't like him. And [Castro] would sometimes put his arms around [CW] and she would push him away."

In contrast, Castro testified that he paid all of CW's family household bills and gave CW gifts, such as jewelry. He further testified that although his relationship with CW included sexual intercourse, he did not have sexual intercourse with CW on the morning

in question because that morning he terminated his relationship with her after being informed by others that CW had another boyfriend.

Jury trial was set for August 25, 1997, and was later rescheduled for October 27, 1997, to accommodate Castro's replacement of his defense counsel.

On October 6, 1997, defense counsel filed a Motion for Mental Examination of Defendant pursuant to HRS § 704–404 (Supp.1998) in which he gave notice of Castro's intention to rely on the defense of mental irresponsibility. In the motion, defense counsel stated that he "believes that [Castro] is in need of a mental examination to determine his present fitness to proceed, his mental condition at the time of the alleged offense, and the existence of any mental disease, disorder or defect which would affect [Castro's] penal responsibility." Defense counsel offered the following observations (hereafter "Defense Counsel's Observations") in support of his request for a mental examination: (1) Castro is pending trial for other serious offenses—Promotion of a Dangerous Drug in the Third Degree in Cr. No. 96–1863 and Kidnapping in Cr. No. 97–0764; (2) Castro has had two prior attorneys whom Castro felt were conspiring with the prosecution; (3) during attorney/client interviews, Castro does not listen to and/or comprehend what the attorney discusses with him; (4) during interviews, Castro appears unable to concentrate on what is being said and looks around and comments on what is going on around him; (5) Castro has been fixated on his belief that the events for which he is charged are part of a conspiracy between the Honolulu Police Department, the prosecution, and the witnesses; (6) Castro is extremely impatient with any counseling by his attorney, wants to proceed to trial immediately, and feels that divine guidance will result in his being vindicated; (7) on Sunday, September 21, 1997, after a probing inquiry of Castro, defense counsel was informed that Castro suffered severe head injuries about three years ago and was under treatment by physicians for head injuries; (8) Castro admitted to a history of chronic use of methamphetamine; and (9) defense counsel believes that Castro is unable to work with counsel in

preparation for trial because of a mental instability or brain damage.

The following facts relate to item (2) above: on April 9, 1997, the public defender was appointed as defense counsel; on April 29, 1997, the public defender moved to withdraw and to have a substitute counsel appointed because of a conflict of interest; on May 7, 1997, the motion was granted; on May 15, 1997, Donald Wilkerson (Wilkerson) was appointed as defense counsel; on June 12, 1997, and June 19, 1997, Wilkerson moved to withdraw as counsel at Castro's request; and on July 1, 1997, the court appointed Joseph R. Mottl III as defense counsel.

At the hearing on October 8, 1997, defense counsel requested

that given [Castro's] concerns about proceeding to trial immediately, in fact if you can consolidate these, he probably would, but we would ask—I think reluctantly, given the time and his demands, but balancing that with my feelings, we would ask for—if the Court's inclined to grant this, just a one panel, to reduce any delay in us trying to assemble a three panel.

So he would appreciate it. And I think—I think my relationship with him could be in jeopardy also.

. . . .

MR. MOTTL: So we were interested in proceeding to trial as soon as possible.

Counsel for the State objected in relevant part as follows:

The Declaration of Counsel by [defense counsel] indicates that the defendant may have suffered some kind of trauma to the head, which possibly resulted in some brain damage.

If that's the case, I don't even know if a one panel or a three panel is gonna be appropriate.

Castro and the court then had a conversation in relevant part as follows:

THE DEFENDANT: Um, excuse me, um, ma'am. Um, instead of prolonging the court, why don't we go court, 'cause I'm not the victim, right?

I'm not the victim. You—you know what I mean?

. . . .

THE DEFENDANT: Yeah. I—I am the victim, what I gettin accused of.

. . . .

THE DEFENDANT: Um, I—I not—I not mental or anything, ma'am.

THE COURT: No, but you—you—you had—did you have this head injury?

THE DEFENDANT: Yeah, when the cops when lick me.

. . . .

THE COURT: . . .

Do you feel you have any problems concentrating on what Mr. Mottl is telling you when the two of you -

THE DEFENDANT: No.

THE COURT:—talk?

You don't?

THE DEFENDANT: No.

I'm not mental, or mentally ill or—I know everting what he saying. I understand everyting what he saying, and I understand why I'm re—why I'm coming here. You know what I mean?

I understand alla dat.

. . . .

THE COURT: Tell me how long you been using drugs.

THE DEFENDANT: I did drugs a few—a few months, hea and der.

THE COURT: For how long?

THE DEFENDANT: But I'm not maja.

THE COURT: For how long?

THE DEFENDANT: Not long.

THE COURT: Since when?

How—how old are you now?

THE DEFENDANT: Forty-one.

THE COURT: Sin—and since when might you have been taking drugs?

. . . .

THE DEFENDANT: Since when I started taking drugs?

THE COURT: Uh-huh.

. . . .

THE DEFENDANT: Twelve.

. . . .

THE DEFENDANT: Yeah. But I have no problem, uh, understanding none a dis.

I don't see why we just no go court. You know what I mean?

THE COURT: Well, Mr. Mottl, your motion's denied. . . .

## POINT ON APPEAL

Castro contends that the circuit court reversibly erred when it entered its October 21, 1997 Order Denying Motion for Mental Examination of Defendant.

## RELEVANT STATUTES

HRS states in relevant part as follows:

§ 704–402 [ (1993) ] **Physical or mental disease, disorder, or defect excluding responsibility is an affirmative defense; form of verdict and judgment when finding of irresponsibility is made.** (1) Physical or mental disease, disorder, or defect excluding responsibility is an affirmative defense.

. . . .

§ 704–403 [ (1993) ] **Physical or mental disease, disorder, or defect excluding fitness to proceed.** No person who as a result of a physical or mental disease, disorder, or defect lacks capacity to understand the proceedings against the person or to assist in the person's own defense shall be tried, convicted, or sentenced for the commission of an offense so long as such incapacity endures.

§ 704–404 [ (Supp.1997) ] **Examination of defendant with respect to physical or mental disease, disorder, or defect.** (1) Whenever the defendant has filed a notice of intention to rely on the defense of physical or mental disease, disorder, or defect excluding responsibility, or there is reason to doubt the defendant's fitness to proceed, or reason to believe that the physical or mental disease, disorder, or defect of the defendant will or has become an issue in the case, the court may immediately suspend all further proceedings in the prosecution. . . .

(2) Upon suspension of further proceedings in the prosecution, the court shall appoint three qualified examiners in felony cases and one qualified examiner in nonfel-

ony cases to examine and report upon the physical and mental condition of the defendant....

(3) In such examination any method may be employed which is accepted by the medical profession for the examination of those alleged to be suffering from physical or mental disease, disorder, or defect....

....

**§ 704–405** [ (1993) ] **Determination of fitness to proceed.** When the defendant's fitness to proceed is drawn in question, the issue shall be determined by the court. If neither the prosecuting attorney nor counsel for he defendant contests the finding of the report filed pursuant to section 704–404, the court may make the determination on the basis of such report. If the finding is contested, the court shall hold a hearing on the issue. When the report is received in evidence upon such hearing, the party who contests the finding thereof shall have the right to summon and to cross-examine the persons who joined in the report or assisted in the examination and to offer evidence upon the issue.

....

**§ 704–408** [ (1993) ] **Determination of irresponsibility.** If the report of the examiners filed pursuant to section 704–404, or the report of examiners of the defendant's choice under section 704–409, states that the defendant at the time of the conduct alleged suffered from a physical or mental disease, disorder, or defect which substantially impaired the defendant's capacity to appreciate the wrongfulness of the defendant's conduct or to conform the defendant's conduct to the requirements of law, the court shall submit the defense of physical or mental disease, disorder, or defect to the jury or the trier of fact at the trial of the charge against the defendant.

**§ 704–409** [ (1993) ] **Access to defendant by examiners of defendant's choice.** When, notwithstanding the report filed pursuant to section 704–404, the defendant wishes to be examined by one or more qualified physicians or other experts of the defendant's own choice, such examiners shall be permitted to have reasonable ac-cess to the defendant for the purpose of such examination.

## DEFENDANT'S RIGHTS IN A CRIMINAL CASE

In *Dusky v. United States,* 362 U.S. 402, 402, 80 S.Ct. 788, 788–89, 4 L.Ed.2d 824 (1960), the United States Supreme Court stated:

> We also agree with the suggestion of the Solicitor General that it is not enough for the district judge to find that "the defendant (is) oriented to time and place and (has) some recollection of events," but that the "test must be whether he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him."

An authority on the subject has stated in relevant part as follows:

> It is axiomatic that the conviction of an accused person who is mentally incompetent violates due process, as was stated in *Pate v. Robinson* [, 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966) ]. In addition, if there is a "bona fide doubt" as to the defendant's competence, the trial judge must raise the issue *sua sponte* and weigh it at a "suitable hearing" safeguarded with procedures adequate to "permit a trier of fact reasonably to assess an accused's competency against prevailing medical and legal standards." ... Other courts have couched this test in terms of whether the doubt as to a defendant's competency is "substantial" or "clear[ ] and unequivocal[ ], so as to determine whether there is a "reasonable doubt" as to whether the defendant is not fit to stand trial.

> Put another way, there need not be "a full-blown competency hearing everytime there is the slimmest evidence of incompetency, and, at least under federal statute, a motion to determine competency can be denied "only if the trial judge correctly determines that the motion is frivolous, is not in good faith, or does not set forth the grounds for believing that the accused may be incompetent." As one federal court has phrased the issue, "*Pate* does not require

that a trial judge be an omniscient psychiatrist, but that he act reasonably on the objective facts before him."

M. Perlin, *Mental Disability Law Civil and Criminal,* § 14.04, at 216–18 (1989) (citations omitted).

In 1999, in *State v. Janto,* the Hawaiʻi Supreme Court noted that the statutory criteria for determining whether a criminal defendant is legally competent to proceed to trial is as follows:

Pursuant to HRS § 704–403, the trial court must determine whether the defendant either (1) lacks capacity to understand the proceedings against him or her; or (2) lacks capacity to assist in his or her defense. *Accord Siah v. State,* 837 P.2d 485, 487 (Okla.Crim.App.1992), (noting that "competency to stand trial consists of two elements, statutorily defined: (1) the present ability of a person ... charged with a crime to understand the nature of the charges and proceedings brought against him; and (2) the ability to effectively and rationally assist in his defense." (citing Okla. Stat. tit. 22, § 1175.1 (1981)).

*State v. Janto,* 92 Hawaiʻi 19, 28 n. 3, 986 P.2d 306, 315 n. 3 (1999).

█ In other words, pursuant to HRS § 704–403, *Dusky,* and *Janto* (the HRS § 704–403/Dusky/Janto Requirements), it is constitutional/statutory law that a defendant in a criminal case cannot be tried, convicted, and/or sentenced for the commission of an offense if and when, (1) as a result of a physical or mental disease, disorder, or defect, he/she lacks capacity (i) to understand the nature of the charges and proceedings against him/her, or (ii) to assist in his own defense, or (2) he/she does not have (i) a sufficient present ability to consult with his or her lawyer with a reasonable degree of rational understanding, and (ii) a rational as well as factual understanding of the proceedings against him/her.

There are many reasons why a person was/is unfit to proceed and/or had/has a relevant physical or mental disease, disorder, or defect. These conditions are often temporary. *See* M. Perlin, *Mental Disability Law Civil and Criminal,* § 15.25, at 354–6. The

problem was stated by other authorities on the subject as follows:

To use a metaphor, imagine sanity as driving down the proper side of the road.... Mental disease sometimes makes you disregard that center line, and even the side lines, so that you start occasionally driving on the oncoming lane and on the shoulders, perhaps even in the ditches on either side of the road, all at breakneck speed. "Normal" people may deviate slightly from the correct lane, but they will spend the majority of their driving time centered....

....

... As we go down the Road of Life, some of us (normal individuals) will stay more or less in the right lane, occasionally exceeding the speed limit, sometimes skirting the center line, sometimes even the side line. A psychotic individual, perhaps with sociopathic tendencies, will veer from the right lane into the left, oncoming lane when a car approaches in the opposite direction, all at breakneck speed, perhaps even doing so when the oncoming car is merely a hallucination....

....

However, all of these individuals will, at some point or other, find themselves in the right lane. At such an instant in time, for example, in a courtroom, such individuals may act within normal boundaries and appear competent to stand trial. They will be able to identify the judge, the defense attorney, themselves, and understand the charge. However, that does not mean that the manner in which the current criminal justice system treats such people makes sense in light of their condition. For example, will they be able to stay in the right lane throughout the trial to assist in their defense? Questionable. Were they on the wrong side of the road when the crime was committed? Highly likely. Will they find themselves on the wrong side of the road in the future? Highly likely, if they remain without treatment. Are they in full command of their faculties? Sometimes.

E. Beecher–Monas and E. Garcia–Rill, *The Law and the Brain: Judging Scientific Evidence of Intent,* in The Journal of Appellate

Practice and Process, Vol. 1, No. 2 at 265–70 (Summer 1999).

## STANDARD OF REVIEW

■ In *State v. Tyrrell,* 60 Haw. 17, 22, 586 P.2d 1028, 1031 (1978), the Hawai'i Supreme Court concluded that "[w]hen there is no dispute as to the relevant evidence before the trial court, it is for the reviewing court to determine what inferences are to be drawn from the undisputed facts and whether further inquiry into the defendant's competence was required." In this context, *Tyrrell* applied the usual two-step appellate review process. The findings of fact are step one. The conclusions of law are step two.

In 1996, this court concluded that

the appellate court must initially assess whether the trial court made its competency determination based on a correct legal standard. This is a question of law subject to *de novo* review. . . . If the trial court evaluated a defendant's competency by the correct standard, the second inquiry on appellate review is whether the trial court's determination of a defendant's competency is fairly supported by the record of the proceeding at which the determination was made. In other words, the substantial evidence standard of review governs the second inquiry.

*State v. Soares,* 81 Hawai'i 332, 350, 916 P.2d 1233, 1251 (1996) (citations omitted).

In 1999, in *Janto,* the Hawai'i Supreme Court responded:

This court has never addressed the correct standard of review for a circuit court's determination that a criminal defendant is fit to proceed. We disagree with the *Soares* formulation and, instead, will review the trial court's determination under the abuse of discretion standard.

. . . .

... There is no need for an appellate court to engage in *de novo* review of the legal standard utilized by the trial court, where there is only one standard to be applied.

We overrule *Soares* and hold that the trial court's determination that a defendant is competent to stand trial will be reviewed under an abuse of discretion standard. . . . The standard for determining competence is statutorily mandated by HRS Chapter 704 and primarily a matter for the professional determination of the examiners appointed by the trial court in accordance with HRS Chapter 704. An abuse of discretion standard is appropriate because the determination relies upon the trial court's assessment of the testimony of expert witnesses and its observational assessment of the defendant.

*Janto,* 92 Hawai'i at 28–29, 986 P.2d at 315–16 (1999) (footnote omitted).

■ Although it appears that the trial court's decision that the facts satisfied the HRS § 704–403/Dusky/Janto Requirements is a usual step two conclusion of law reviewed under the right/wrong standard of review, the *Janto* opinion held that it is reviewed under an abuse of discretion standard of review.[1]

## TRIAL COURT'S DUTY TO APPOINT PROFESSIONAL EXAMINERS

In *State v. Tyrrell,* 60 Haw. at 22, 586 P.2d at 1031, the Hawai'i Supreme Court concluded that the appointment of three examiners pursuant to HRS § 704–404 is a matter of the court's discretion and noted:

Appellant ... contends that in this case due process required that appellant be examined by a panel of three examiners in accordance with the statutory procedure.

---

1. When the court's decision being reviewed is a finding of fact, the standard of review is either the substantial evidence standard (jury trial) or the clearly erroneous standard (bench trial).

With respect to all other decisions, when the decision is a decision of law and/or there is and can be only one right decision, the standard of review is the right/wrong standard.

With respect to all other decisions, the court has some degree of discretion. The question

whether the court's decision in the particular case was an abuse of its authorized discretion is reviewed under the abuse of discretion standard of review.

*See,* Yoshii, *Standards of Review,* 7. U. Haw. L.Rev. 273 (1995); Haitsuka, *Hawaii Appellate Standards of Review* revisited, 18 U. Haw. L.Rev. 645 (1996).

But appellant has referred us to no authority indicating that the statutory procedure is constitutionally mandated. The Court carefully points out in *Drope* that its conclusion that a statutory procedure is constitutionally adequate to provide the inquiry into competency required for due process does not imply that the statutory procedure must be followed in order to provide due process. 420 U.S. at 172 [95 S.Ct. 896]. Moreover, no general standard has been prescribed in these cases with respect to the nature or quantity of evidence necessary to require resort to a constitutionally adequate procedure."

Most recently, in *Janto*, 92 Hawai'i at 29, 986 P.2d at 315, the Hawai'i Supreme Court concluded that the trial court's determination of competence: (1) is "primarily a matter for the professional determination of the examiners appointed by the trial court in accordance with HRS Chapter 704"; (2) "relies upon the trial court's assessment of the testimony of expert witnesses and its observational assessment of the defendant"; and (3) is reviewed on appeal under the abuse of discretion standard of review.

On one hand, it appears that *Janto*'s conclusion (2) cannot be made in the absence of the evidence mentioned in *Janto*'s conclusion (1). In other words, when there is a valid reason to doubt the defendant's competence at a relevant time, the trial court must have the benefit of the "professional determination of the examiners appointed" pursuant to HRS § 704–404.

On the other hand, notwithstanding the language of *Janto*'s conclusion (1), the result of *Janto*'s conclusions (2) and (3) is that, where the decision of the examiner differs from the decision of the trial court, the trial court's decision prevails.

Although, *Janto*'s conclusion (2) recognizes that the trial court's decision is a finding of fact, *Janto*'s conclusion (3) disagrees with *Janto*'s conclusion (2).

## DISCUSSION

■ Defense Counsel's Observations presented a valid reason to doubt that Castro satisfied all of the HRS § 704–403/Dusky/Janto Requirements. After the court's conversation with Castro, the court implicitly decided that defense counsel's doubt about Castro's satisfaction of all of the HRS § 704–403/Dusky/Janto Requirements was not reasonable. In light of *Janto*, especially *Janto*'s conclusion (1), we conclude that the court's refusal in Castro's case to appoint examiners in accordance with HRS Chapter 704 was an abuse of its discretion.

■ We note in passing that the fact that Castro at trial did not rely on the defense of mental irresponsibility cannot be used as evidence that he was not mentally irresponsible.

Since appellant was not afforded a fair opportunity to develop a defense of insanity, we see no merit to appellee's assertion that because appellant's new counsel subsequently waived the defense of insanity he is now precluded from raising the error of the District Court in denying the pretrial motion for a mental examination. Having been denied the opportunity to establish the basis of an insanity defense, the defendant cannot now seriously be charged with asquiescing [sic] in that denial because of his failure to assert that defense. *Cannady v. United States*, 351 F.2d 817, 820 (D.C.Cir.1965).

## CONCLUSION

Accordingly, we vacate the circuit court's March 24, 1998 Judgment, Guilty Conviction and Sentence, reverse the October 21, 1997 Order Denying Motion for Mental Examination of Defendant, and remand for further proceedings consistent with this opinion.

### Concurring Opinion of ACOBA, J.

I concur in the result, but with a different perspective.

Hawai'i Revised Statutes (HRS) § 704–403 (1993) reiterates the constitutional due process prohibition against trying a person who lacks the capacity to assist in his or her own defense.[1] Relatedly, HRS § 704–404 (1993 and Supp.1999) provides that

[w]henever the defendant has filed a notice of intention to rely on the defense of physical or mental disease, disorder, or defect

---

1. Hawai'i Revised Statutes (HRS) § 704–403 (1993) states that

[n]o person who as a result of a physical or mental disease, disorder, or defect lacks capacity to understand the proceedings against the person or to assist in the person's own defense shall be tried, convicted, or sentenced for the

excluding responsibility, or there is *reason* to doubt the defendant's fitness to proceed, or *reason* to believe that [a] physical or mental disease, disorder or defect ... will or has become an issue in the case, the court may immediately suspend all proceedings[,]

and upon suspension "shall appoint three qualified examiners in felony cases[.]" HRS § 704–404(1) and (2) (emphases added).

While the term "may" suggests that discretion inheres in the trial court as to whether to appoint examiners, the balance of the pertinent statutory language suggests that only some rational basis for convening a panel is necessary to trigger the court's appointive power. Absolutely no burden of proof is placed upon the defendant in requesting a panel evaluation. The filing of a notice aside, what would seem to be the most minimal of standards—that there is *"reason"* to doubt fitness, or to believe that the defendant's physical or mental responsibility will or has become an issue in the case—invokes the exercise of the court's discretion. Hence, the court is duty bound to *sua sponte* convene such a hearing if it itself has or is presented with rational basis for believing that the physical or mental defect of a defendant will become an issue on the question of fitness or responsibility. Such a rational basis standard sets its face against any grudging application of the statute by the trial courts.[2]

In this case, the fitness of Defendant–Appellant Bryan Castro (Defendant) to proceed to trial had indisputably become an issue in the case despite Defendant's own wishes. Under the instant circumstances it can hardly be questioned that court-appointed counsel acted in good faith and out of a professional duty owed his client and the court when he filed the motion for an examination of Defendant's trial fitness and responsibility for the offense charged. As demonstrated by the court's colloquy with defense counsel, counsel had taken a position which placed him in direct conflict and on a tenuous footing with his own client who had resisted such an examination. Counsel's affidavit was not "premised only on unspecified

commission of an offense so long as such incapacity endures.
The statute appears somewhat redundant since the ability to assist in one's own defense would seem to incorporate the ability to understand the proceedings.

conduct during his conferences with [Defendant]," *State v. Tyrrell*, 60 Haw. 17, 23 n. 3, 586 P.2d 1028, 1032 n. 3 (1978), but referred to specific conduct of Defendant which convinced counsel that an examination should be performed.[3]

"Judges must depend to some extent on counsel to bring" questions of fitness to stand trial to the court's attention. *Drope v. Missouri*, 420 U.S. 162, 176–77, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975). Patently, it is at the pretrial stage where such questions, if raised, should be resolved. "[A]t that stage ... it would have been, at the very least, the better practice to order an immediate examination[.]" *Id.* at 177, 95 S.Ct. 896. Such a practice removes from trial the concern that incapacity which is not readily apparent to lay observation will surface during trial proceedings or, much worse, after trial has ended. Obviously, if a defendant is found fit to proceed based upon expert testimony in the record, the question of whether an examination should have been judicially ordered or not is largely removed from judicial re-examination. *See State v. Janto*, 92 Hawai'i 19, 29–30, 986 P.2d 306, 316–17 (1999) (holding that a trial court's determination of a defendant's competency is reviewed under the abuse of discretion standard, and that the trial court acted appropriately in evaluating a defendant's fitness in light of expert testimony). If, on the other hand, expert examination is rejected and it is subsequently determined that an examination should have been conducted, the violation of a defendant's due process rights is irremediable because of "the inherent difficulties of such a nunc pro tunc determination under the most favorable [of] circumstances." *Drope*, 420 U.S. at 183, 95 S.Ct. 896. *See also State v. Soares*, 81 Hawai'i 332, 349, 916 P.2d 1233, 1250 (1996), reversed on other grounds by *Janto*, 92 Hawai'i 19, 986 P.2d 306. This is especially so if the determination that an examination should have been conducted is made after an imprisoned defendant has served most of his or her term.

**2.** I do not mean to imply that the trial court in the instant case acted in this manner.

**3.** All counsel are officers of the court and subject to serious professional and personal sanctions for filing unfounded affidavits with the court.

In the most egregious of circumstances, a mentally ill defendant who otherwise should have been subjected to examination, HRS § 704–404, and treatment, HRS § 704–406(1) (1993) (providing for commitment of a defendant for "detention, care, and treatment"), may remain untreated in prison and upon his or her release, present a further or greater risk to public safety. Because such a determination may come years after the case has run its course in state court and conceivably on habeas corpus grounds in federal court, retrial of a defendant may be rendered impossible, adversely affecting the community's interest in prosecuting crimes. It is not surprising, then, that in principle the prosecution did not object to Defendant's request for an examination.[4] The defense and Plaintiff–Appellee State of Hawai'i, as well as the public, would have benefitted from the resolution of questions raised by counsel's affidavit.

In sum, I believe the statute requires only that there be a rational basis for convening an examination. At the very least, the issue of Defendant's fitness to proceed had become an issue in the case and counsel's affidavit contained facts and observations upon which Defendant's fitness could reasonably be called into question. I would agree, then, that in rejecting Defendant's request for an examination, the court abused its discretion.

I note that defense counsel "reluctantly, given the time and [Defendant's] demands" to go to trial, was amenable to having Defendant examined by one expert rather than by three experts as seemingly mandated in HRS § ·704–404(2) for nonfelony cases. Although under the literal language of HRS § 704–404(2) the appointment of "three qualified examiners" is called for, the supreme court has held that the discretion inhering in a trial court to suspend all further proceedings pending a physical or mental examination includes the discretion to appoint only one examiner and thus to initiate a process involving less than a full panel of experts. *Tyrrell,* 60 Haw. at 21, 586 P.2d at 1031. While trial courts may have seized upon this holding as a means of curtailing the time spent on these types of proceedings, such an approach, in my view, should only be undertaken cautiously. The supreme court qualified its "one expert" holding in *Tyrrell,* stating that it did "not endorse an examination by a single psychiatrist, based on a single interview with the defendant, as sufficient to remove the question of competency to stand trial in the face of evidence raising a substantial question of competency." *Id.* at 23 n. 3, 586 P.2d at 1032 n. 3 (citation omitted). *Tyrrell* was expressly premised "on the circumstances of [that] case," *id.,* and therefore,

---

**4.** At the October 8, 1997 hearing on the motion for mental examination filed by Defendant–Appellant Bryan Castro (Defendant), the deputy prosecuting attorney objected to Defendant's motion only because he believed a physical rather than "mental" examination, as requested by defense counsel, was required:

> THE COURT:—and, [Prosecutor], what it is [sic] that you were about to represent?
>
> [PROSECUTOR]: If—if that's the position [Defense counsel's] gonna be taking at this point, I think we're gonna have to object to the motion for a mental.
>
> The Declaration of [Defense c]ounsel ... indicates that the [D]efendant may have suffered some kind of trauma to the head, which possibly resulted in some brain damage.
>
> If that's the case, I don't even know if a one panel or a three panel is gonna be appropriate.
>
> THE COURT: Right.
>
> [PROSECUTOR]: *He may need a neuropsyche.*
>
> THE COURT: *Right.*
>
> [PROSECUTOR]: But that's not what he's moving for.
>
> THE COURT: *Right.*

> [PROSECUTOR]: *So—*
>
> THE COURT: Okay.
>
> . . . .
>
> THE COURT: Okay. Thank you.
>
> . . . .
>
> [Defense counsel], that was the point I was gonna raise, and that's one touched upon by [the Prosecutor]. The, um—whenever we talk about mental examinations, more often than not we're talking about, you know, the softer sciences, the psychiatry and psychology.
>
> *But here in your declaration, you're talking about severe head injury, possibility of brain damage,* and—and the stuff that goes with that. And I was just wondering how helpful, you know, a panel of psychologists would be to—to [Defendant's] case. *But I—I just put that out there.*
>
> . . . .

(Emphases added.)

HRS § 704–404 (1993 and Supp.1999) relates to diseases, disorders or defects of a *physical* or mental nature. Obviously, if Plaintiff–Appellee State of Hawai'i or the first circuit court believed a "neuropsych" examination was required, one should have been ordered under the procedure set forth in HRS § 704–404.

may represent an isolated exception to the requirements of administering the fitness procedures under HRS § 704–404.

Finally, the fact that defense counsel did not pursue at trial the defense afforded by HRS § 704–402, is not determinative of whether he may on appeal raise the issue of his client's fitness to proceed. The question of whether Defendant was fit to proceed is a separate one from that of whether any mental or physical defect affected his criminal responsibility for the crime charged. Additionally, I do not believe that Defendant is foreclosed on remand from relying on the HRS § 704–402 defense. In the ordinary course, an expert panel usually performs a dual fitness and responsibility examination of a subject defendant. The rejection of counsel's request for a fitness examination foreclosed any realistic possibility that the court thereafter would appoint experts for any further examination. Indeed, the court's order of October 21, 1997 denied Defendant's motion in its entirety.